# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION _____

UNITED STATES OF AMERICA

v.

PETRU CLADOVAN

**F I L E D**

MAY **2 1** 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**MAGISTRATE JUDGE ASHMAN**

CRIMINAL COMPLAINT

CASE NUMBER:

**08CR    403**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Between on or about June 6, 2007 and on or about August 7, 2007, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, Petru Cladovan, corruptly gave, offered and agreed to give anything of value to any person, namely $2000 cash, with intent to influence and reward an agent of the City of Chicago, a local government, in connection with any business, transaction, and series of transactions, involving anything of value of $5,000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 7, 2006, through August 7, 2007;

In violation of Title 18, United States Code, Section 666(a)(2).

I further state that I am a Special Agent, United States Postal Inspection Service, and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof:  _X_ Yes        ____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 21, 2008
Date

at  Chicago, Illinois
City and State

Hon. Martin Ashman, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, David B. Hodapp, being duly sworn under oath, depose and state as follows:

## I.      BACKGROUND OF AFFIANT

1.      I am a Postal Inspector with the United States Postal Inspection Service and have been so employed since September 1987.  In connection with my official duties, I have investigated violations of federal criminal law, including violations relating to public officials.  I have received training and participated in all normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use if informants, and undercover operations.  I have also received training in the enforcement of laws concerning, among other things, public corruption and white-collar crime.

## II.     PURPOSE OF AFFIDAVIT

2.      This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging PETRU CLADOVAN with a violation of Title 18, United States Code, Section 666 (a)(2), charging that between on or about June 6, 2007 and on or about August 7, 2007, CLADOVAN corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence or reward an agent of the City of Chicago, a local government, in connection with any business, transaction, and series of transactions of the City of Chicago, involving anything of value of $5,000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 7, 2006 through August 7, 2007.

1

3.     More specifically, in 2007, CLADOVAN was the owner and developer for two properties, one located at 2754 West Washington Boulevard and the other located at 2734 North Fairfield.  As more fully described below, on two occasions, CLADOVAN paid cash bribes through a cooperating witness (CW1) to City officials, believing that CW1 was passing on the cash bribes paid by CLADOVAN to inspectors at the City of Chicago Department of Zoning in exchange for favorable treatment. CLADOVAN paid $2000 to CW1 on August 7, 2007 in order to fraudulently obtain favorable inspections needed for the issuance of a Certificate of Occupancy for the building located at 2754 West Washington Boulevard.  In the absence of this bribe payment by CLADOVAN, the 2754 West Washington property would not have received favorable inspections due to several inspection deficiencies. CLADOVAN also paid $500 to CW1 on August 21, 2007, in exchange for CW1 obtaining a fraudulent Zoning Certificate of Compliance for the building located at 2734 North Fairfield.  The Zoning Certificate of Compliance falsely certified that a zoning review of the property had been performed and certified that the number of units were in compliance with zoning ordinances.

4.     This investigation has been jointly conducted by the United States Postal Inspection Service ("USPIS"), the City of Chicago Office of the Inspector General ("IG") and the Federal Bureau of Investigation ("FBI").  The information contained in this Affidavit is based on my personal observations and experience in addition to information obtained from other law enforcement agents participating in this investigation, witnesses, documents, and my review of recorded conversations.  Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this

investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe CLADOVAN committed violations of 18 U.S.C. § 666.

## III.   EXPLANATION OF THE BUILDING PERMIT PROCESS AND CITY DEPARTMENTS

5.     The process for issuing building permits and monitoring construction projects is governed by several departments within the City of Chicago, including the Department of Zoning ("Zoning"), the Department of Construction and Permits ("DCAP"), the Department of Buildings ("Buildings") and the Department of Administrative Hearings ("AH").

6.     The principal role of Zoning is to enforce Chicago's Zoning Ordinance, to implement the city's land use policies and to maintain and update the city's official zoning maps. Developers seeking to obtain a building permit for new construction and renovation projects which require architecture plans receive an initial review of their architectural plans in Zoning to assure that the project conforms to the official zoning and land use policies of the City of Chicago. Zoning reviews the survey plats, parking lot layouts and site plans to ensure that projects conform to the Zoning Ordinance. When a proposed development is not in compliance with the Zoning Ordinance or permitted use, a developer has the option of seeking an administrative adjustment or a zoning variance. The administrative adjustment process is a streamlined procedure for minor modifications of selected zoning standards. The zoning variance procedures involve review and approval of the requested changes by the Zoning Board of Appeals. Zoning is also responsible for administering the landscape ordinance within the zoning code which governs landscaping of all business, commercial and large residential projects. In

addition, zoning is responsible for issuing Certificates of Occupancy (a certificate from the City certifying that a structure is fit for human habitation) for construction projects containing between one to three dwelling units and for issuing Zoning Compliance Certificates (a certificate from the City certifying that a structure meets the applicable zoning requirements) for the occupancy, use, or change of use of any property in the city. Projects receive an initial review in Zoning by a zoning plan examiner ("ZPE"). On-site investigation of projects to ensure compliance with the Zoning Ordinance, including the landscape ordinance, and Certificate of Occupancy reviews are performed by zoning inspectors.

       7.     DCAP is responsible for issuing construction permits. Prior to the creation of DCAP in April 2003, construction permits were issued by Buildings. A permit application must include the names and City license numbers of the general contractor and each subcontractor who intends to work on the construction project. To obtain a general contractor's license from the City, an applicant must mail a license application to an address maintained by the Department of Buildings. License applications must be renewed by mail every year. Generally, the construction permit application process follows one of three different tracks: the Easy Permit Process ("EPP"), Standard Review Plan process, or Developer Services process. EPP is used to obtain construction permits for repair or replacement of existing elements of a building, when no structural changes to the building will be made. Standard Review Plan (also referred to as Open Plan Review) is used to obtain construction permits for small to mid-sized construction and renovation projects requiring architectural drawings. The Standard Review Plan process involves an initial assessment of a construction project by

a DCAP project manager. After the project manager review, the architectural plans receive technical reviews of appropriate disciplines which include, among others, electrical, plumbing, ventilation, structural, architectural, landscape and fire prevention. The purpose of each discipline review is to ensure that the proposed project is in conformance with the building codes and regulations of the City of Chicago. The Developer Services process is used to obtain construction permits for large and complex projects. In January 2008, DCAP merged back into the Buildings Department.

8.    Buildings is responsible for the enforcement of the Chicago Building Code governing the construction, rehabilitation and maintenance of structures within the City of Chicago. Within Buildings is the New Construction Bureau. New construction inspectors' primary role is to perform inspections to ensure that construction and renovation work conforms to the permits that have been issued by DCAP. Building inspectors can also respond to complaints regarding structures, including emergencies that occur after working hours, and they can issue violation notices to building owners when a structure is not in conformance with the Building Code. Inspections can also be generated by the public by dialing 311, the non-emergency number for city services. Inspectors can also issue "stop work orders" to stop any construction that is done without a permit, contrary to an approved permit, and other forms of construction that poses a threat to the health and safety of the public. A stop work order is a directive from the Department of Buildings, addressed to the owner of property on which construction or demolition work is proceeding without proper authorization. The stop work order prohibits further work, and in some cases requests the removal of work already completed, until or unless an appropriate construction permit has been obtained. There

are different procedures for releasing each kind of stop work order, which can include paying fines and/or paying additional permit fees. Some releases can occur at the City's satellite offices (additional offices located in various neighborhoods for the convenience of property owners and developers), while others involve the applicant presenting the plans and application to the DCAP or to another Department, usually at City Hall. Inspectors sign the back of a contractor's construction permit when an inspection is performed and the inspector determines that the completed work is within the requirements of the Building Code and the scope of the construction permit. Certificates of Occupancy for construction and renovation projects involving four or more units are also issued by Buildings. Building Inspectors conduct inspections of projects prior to the issuance of Certificates of Occupancy. Finally, Buildings has historically maintained a mainframe computer database that contains information about buildings in the City of Chicago, including the number of original units in each building.

9.    AH serves as a quasi-judicial tribunal for the expedient, independent and impartial adjudication of municipal ordinance violations. AH has several divisions, including a Building Division. The purpose of the Building Division is to adjudicate cases initiated by the Buildings, Fire and Zoning departments.

10.    Contractors, developers, and homeowners may hire a permit expediter to facilitate the construction permit application process. The services performed by a permit expediter include, among other things: completing construction permit application forms; collecting and submitting relevant documents to DCAP and Zoning; waiting in line at City Hall for plan reviews; scheduling building inspections; meeting with architects, contractors, developers, homeowners, City of Chicago inspectors and other

City of Chicago officials; resolving building code violations; and obtaining Certificates of Occupancy. City of Chicago employees are prohibited from acting as permit expediters.

11.    Obtaining timely reviews, approvals, and permits is important to developers. Waiting for a lengthy period of time for a review, failing to pass an inspection, or the issuance of a stop work order can have significant financial consequences for developers. These circumstances can preclude developers from starting or completing the work that needs to be done on a project (thereby lengthening the period of time for a project which may add costs or at least delay the time at which a developer can recoup capital tied up in a project), or require developers to do additional work on a project (thereby increasing the cost of the project). For example, as described in detail below, CLADOVAN paid bribes to City Officials in exchange for providing favorable and more expeditious building inspection and zoning inspection reports related to a Certificate of Occupancy for a property located at 2754 West Washington Boulevard. A Certificate of Occupancy is significant from a financial standpoint for the developer because typically banks will require the Certificate of Occupancy before agreeing to lend money to a buyer for the purchase of the property. Thus, until the Certificate of Occupancy is issued, a developer is unable to sell the property or units in the property and recoup capital put into the project. CLADOVAN also attempted to pay a bribe to a City official in order to obtain a Zoning Compliance Certificate for a property located at 2734 North Fairfield. A Zoning Compliance Certificate is significant from a financial standpoint for the developer because the Zoning Compliance Certificate Ordinance requires all parties selling property in the City of Chicago to file a Zoning Compliance

7

Certificate declaring the number of units a property has before a developer can sell the property. Thus, until the Certificate of Zoning Compliance is issued, a developer is unable to sell the property.

## IV.    THE INVESTIGATION

12.    This phase of the criminal investigation began in April 2007, when investigators obtained information concerning a shakedown scheme involving certain individuals, including a particular "expediter," who assisted contractors and developers in the permit application process. Specifically, evidence indicated that a certain building inspector was posting stop work orders on properties and agreeing to lift the order only if the property's owner used this particular expediter. In May 2007, law enforcement agents interviewed the expediter (hereinafter referred to as CW1).[1]

13.    CW1 admitted to paying bribes to City employees for a variety of actions, non-actions, favorable reports or to facilitate a quicker-than-normal inspection or review from approximately 2001 through May 2007. CW1 also admitted to CW1's role in accepting bribes from developers and contractors, which CW1 would pass on to City employees.

---

[1] CW1 has not been charged with any crime. CW1 understands that he/she will be charged with a violation of federal criminal law. No promises have been made regarding what charges will be brought or what sentence CW1 will receive. CW1 is cooperating with the government in the hopes of receiving a benefit in the determination of what charges will be brought and what sentence will be recommended by the government. CW1 has no previous arrests or convictions. Investigators believe CW1 to be reliable. Although CW1 lied to agents during the initial interview about the nature and scope of CW1's relationship with City employees, CW1 has subsequently spoken with investigators numerous times under proffer protection, and is believed to have provided truthful information. CW1 has provided information about bribery activities by over thirty individuals. This information has been corroborated for a number of those individuals by recorded conversations and/or controlled bribe payments.

14.    CW1 began actively cooperating with the government in May 2007. CW1's cooperation has included conducting consensually recorded calls and meetings, as well as playing the role of "bagman" (collecting bribe money from developers and contractors seeking some official act from a City employee or a "priority" handling of a project and paying the bribes to City of Chicago employees).[2]

15.    CW1 has advised law enforcement that it was the practice of developers and contractors with whom CW1 has worked to express a willingness to bribe a City official for actions typically by using coded language, such as "do whatever it takes" (to get an action accomplished). CW1 would also use coded language by asking a developer or contractor if CW1 has a "budget" to work with or if this action is a "priority." CW1 would also use coded language in communicating with the City official, by saying, for example, that an "incentive" is available. In other instances, City officials would solicit bribe payments from CW1 initially, and CW1 would then communicate this to the developer or contractor. The developer or contractor would then pay CW1 for expediting services in addition to the amount of any bribes that CW1 was to pay to City officials.

---

[2]

On June 1, 2007, CW1 entered into a consent agreement with the USPIS to allow the government to autorecord all communications transmitted or received on CW1's cellular telephone in which CW1 participated (including voicemail messages left for CW1). This agreement allowed CW1 to make and receive calls during the course of this investigation outside of the presence of a Postal Inspector and to conduct CW1's business as an expediter. Under the agreement, CW1 was not allowed to let anyone other than CW1 use the cellular telephone and CW1 was also limited to using the cellular telephone for conducting business as an expediter. All calls were recorded. CW1 had no control over the autorecord and could not manipulate whether a call was recorded or not. Pursuant to court orders issued approximately every thirty or sixty days, beginning on June 4, 2007 and continuing to March 28, 2008, (with the exception of a period of time in January 2008 during which the autorecord was not renewed) signed by either the Chief Judge or Acting Chief Judge, all calls sent or received from CW1's cellular telephone for a period of thirty or sixty days were recorded using the same technology employed in a Title III wiretap but without the requirement of contemporaneous monitoring by law enforcement agents.

16.    According to CW1, developers and contractors will pay bribes to employees in Zoning for: a) overlooking violations of the Zoning Ordinance; b) increasing the reported number of existing dwelling units in a building being rehabbed to avoid a costly and time-consuming zoning variance process; c) providing a favorable or expedited inspection for a Certificate of Occupancy; and d) expediting a Zoning Compliance Certificate faster than the normal process.  CW1 has admitted to paying bribes to zoning inspectors for these actions.

17.    CW1 has told investigators that developers and contractors will pay bribes to DCAP employees for: a) speeding up the Standard Plan Review process; and b) obtaining quicker review appointments.  CW1 has admitted to paying bribes to certain clerical employees and technical reviewers in DCAP for these actions.

18.    CW1 has told investigators that developers and contractors will pay bribes to Buildings employees for: a) overlooking construction work which does not conform to City building codes; b) overlooking work performed beyond the scope of a construction permit; c) removing building code violations; d) lifting stop work orders; e) signing off on construction permits without performing an inspection; f) providing favorable or expedited inspections for a Certificate of Occupancy; and g) changing information in the City's mainframe computer system.  CW1 has admitted to paying bribes to inspectors in Buildings for these actions.

19.    CW1 has told investigators that developers and contractors will pay bribes to AH employees for: a) expediting the AH process, and b) negotiating a settlement. CW1 has admitted to paying bribes to Buildings employees assigned to AH to facilitate adjudication of Buildings cases in AH in a manner favorable to CW1's clients.

## V.    PROBABLE CAUSE[3]

20.    According to the City of Chicago Department of Business Affairs and Licensing IRIS (Integrated Revenue Information System) Database, CLADOVAN is a contractor and/or developer who owns ABC Construction Incorporated, doing business as ABC Construction & Plumbing located at 3240 West Division Street, Chicago, Illinois. ABC Construction was incorporated on September 5, 1989. CLADOVAN is listed as the president and secretary of ABC Construction Inc.

### *Historical Bribe Payment Information From CW1*

21.    According to CW1, CLADOVAN has paid bribes in the past through CW1 to City inspectors. Specifically, CW1 recalled passing one such bribe payment from CLADOVAN to zoning inspector Anthony Valentino for a favorable zoning inspection related to a Certificate of Occupancy for a property located on Belle Plaine Avenue in Chicago, although CW1 cannot remember precisely when the bribe payment occurred or the amount.[4]

### *Controlled Bribe Payment Pertaining to 2754 West Washington Boulevard*

22.    On June 6, 2007, at approximately 10:33 a.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN.[5] I have reviewed

---

3

Throughout this Affidavit, I describe various conversations that were consensually recorded. All times listed are approximate. The summaries of the recorded conversations set forth in this Affidavit are based on draft – not final – transcriptions. Finally, the summaries below do not include all potentially criminal consensually recorded conversations, or all statements or topics covered during the course of the conversations.

4

As set forth in detail below, Valentino was also involved in the controlled bribe pertaining to 2754 West Washington Boulevard and has been charged in a separate criminal complaint.

5

On June 1, 2007, CLADOVAN and CW1 had spoken briefly about the Washington property, after CLADOVAN initiated a phone call to CW1 regarding the matter. They agreed that

the recording of this conversation. During the conversation, CLADOVAN told CW1 that he had a building that had a permanent injunction, and he wanted to sell the building. CLADOVAN told CW1 that the work on the property had been done in 2002, but he did not get the final inspections for the occupancy. (Final inspections are necessary in order to obtain the Certificate of Occupancy, lifting the court ordered permanent injunction and permitting the sale of the property.) CLADOVAN informed CW1 that he needed new construction, plumbing, and heating final inspections for the occupancy. CLADOVAN told CW1 that he had the original construction permit for the property and some drawings from about 2002 when he performed the work on the property. CLADOVAN informed CW1 that the property address was located at 2754 West Washington, and the scope of the work on the permit was a deconversion from a 12-unit building to an 8-unit building. CLADOVAN also told CW1 that he had gone to court at the Daley Center, and the judge told him that he needed a Certificate of Occupancy to remove the permanent injunction on his property. CLADOVAN said that he had to go back to court in two weeks.

23. During the call, CW1 then asked CLADOVAN whether "in this case is there a budget to do whatever we need to take care of all of this? . . . To get this through." CW1 has told investigators that the term "budget" was a reference to the availability of money for bribes. CW1 explained to CLADOVAN that "I'll have to see what I can do because this is a court case, the building is occupied, there is not Certificate of Occupancy. So, can we go the other route if needed? I mean do you have a budget to work with to get these scheduled?" CLADOVAN responded by telling CW1 to "handle

they would speak the following week to discuss the matter further.

this the way you can get it done" [which CW1 informed investigators CW1 understood as an instruction to pay a bribe to inspectors as needed]. CW1 asked CLADOVAN whether he had "a sort of a budget in mind." CLADOVAN instructed CW1 to "call the inspector and then when I see you we will talk, ok?"

24.    On June 19, 2007, at approximately 4:02 p.m., CW1 received a call from CLADOVAN. The call was consensually recorded and I have reviewed the recording. During the call, CLADOVAN reminded CW1 about the 2754 West Washington property and that he wanted CW1 to coordinate and set up the final inspections for the Certificate of Occupancy. CLADOVAN reiterated that there was a permanent injunction on the property, which had been deconverted from twelve units to eight. CW1 asked CLADOVAN whether he wanted CW1 to "call the inspectors out" and "do whatever we need to do on your end." CW1 has told investigators that CW1 was referring to paying whatever bribes were needed to inspectors so that a new Certificate of Occupancy could be issued and the permanent injunction lifted. CLADOVAN responded that he did.

25.    On June 20, 2007, at approximately 11:10 a.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN. I have reviewed the recording of this conversation. During the conversation, CLADOVAN informed CW1 he had a court hearing scheduled next week but he did not know if it was his final court hearing. CLADOVAN told CW1 that he needed the permit signed by the inspectors right away.[6]

26.    On July 3, 2007, at approximately 11:09 a.m., at the direction of agents, CW1 consensually recorded a telephone conversation with CLADOVAN. I have

---
[6] The signed permit would indicate the inspection approvals so that the Certificate of Occupancy could be issued.

reviewed the recording of this conversation. During the conversation, CW1 told CLADOVAN that CW1 wanted to meet up with CLADOVAN to discuss the best way to handle all of the inspections before his court date. CLADOVAN told CW1, "I need the inspections. I need to have them done." CW1 confirmed that CLADOVAN wanted CW1 to do "whatever we need to do them." CW1 has told investigators that CW1 was referring to making whatever bribe payments were necessary to make sure that the inspections were done and favorable.

27.    On July 17, 2007, at approximately 10:20 a.m., CW1 received a call from CLADOVAN. The call was consensually recorded, and I have reviewed the recording of this conversation. During the call, CLADOVAN asked CW1 about scheduling the inspections for 2754 West Washington. CW1 told CLADOVAN that CW1 was "trying to put a rush on it" but that the inspectors' schedules were tight. CW1 and CLADOVAN discussed which inspectors CLADOVAN had heard from thus far. CW1 then told CLADOVAN that, "I know you were concerned about the budget, so I'm trying to work on a lower budget with this." CW1 asked CLADOVAN, "do you want me to try to hurry this along and do a better deal with these people" to which CLADOVAN replied that he had court the next day and needed the permit signed. CLADOVAN asked CW1 to "do whatever you can please" [which CW1 told investigators CW1 understood to mean that CW1 should offer whatever bribe money is necessary to make sure that the inspections are done and that the property passes the inspections].

28.    On July 17, 2007 at approximately 11:16 a.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN. I have reviewed the recording of this conversation. During the conversation, CW1 asked CLADOVAN about

conflicting information that CW1 had received from the City regarding the Washington property having two permits, extra basement units, no rough inspections, and having twelve units. (A rough inspection is an inspection done before drywall is installed – thereby allowing the inspector to see the infrastructure inside the wall – and are required for certain types of inspections before the property can pass the specific inspection.) CLADOVAN informed CW1 that there was only one permit for alterations of the eight units and that he did not have any rough inspections for the property. CW1 then asked CLADOVAN how he wanted to handle the "financial end." CLADOVAN responded that "when we got the Certificate, we'll take care of it." CLADOVAN then questioned whether the inspectors would know that there were no rough inspections done on the property. CW1 affirmed that they would know.

29.     On August 2, 2007, at approximately 10:13 a.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN. I have reviewed the recording of this conversation. During the conversation, CW1 informed CLADOVAN that the Certificate of Occupancy for Washington was ready for him to pick up from a certain individual at the City of Chicago Buildings Department facility located at 120 North Racine, Chicago, Illinois. CW1 told CLADOVAN that all he would have to do is go to the specific individual who was typing it up. CW1 told CLADOVAN to make an extra copy for CW1 and that they would "square things away on Tuesday." CW1 has told investigators that CW1 was referring to collecting the bribe payment on Tuesday from CLADOVAN.

30.     On August 6, 2007, at approximately 1:19 p.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN. I have reviewed the

recording of this conversation. During the call, CW1 informed CLADOVAN that CW1 would be downtown tomorrow morning because CW1 had to go to the Zoning Department. CW1 wanted to confirm their appointment for Tuesday. CW1 informed CLADOVAN that they could meet sometime in the afternoon on Tuesday.

31.     On August 7, 2007, at approximately 12:08 p.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN. I have reviewed the recording of this conversation. During the conversation, CW1 arranged to meet CLADOVAN to pick up the bribe payment from CLADOVAN for the Certificate of Occupancy for the Washington project. CW1 told CLADOVAN that CW1 needed to "discuss what you need to bring." CW1 added: "I would like you to maybe stop at the bank or do whatever you need to do so that we can meet up. Because I have a deadline going on here for Washington." CLADOVAN agreed. CW1 further told CLADOVAN that "my fee I told you would be fifteen hundred and total with my fee and the inspectors comes up to thirty five hundred" [referring to $1500 for CW1 fee and $2000 bribe money for inspectors]. CLADOVAN responded: "It's a little steep but that's ok." When CLADOVAN asked if he could write a check, CW1 informed him that CW1 could not take a check "because I have appointments, I have to meet up with these guys. I can't take a check." CLADOVAN and CW1 then made arrangements to meet that afternoon.

32.     On August 7, 2007, CW1 met with agents at the briefing location.[7] An audio recording device was placed on CW1. CW1 drove in CW1's vehicle followed by agents to the meeting location at the Midwest Bank located at 4012 North Pulaski, in Chicago to meet with CLADOVAN in order to pick up the payment from CLADOVAN

---

[7] For this and each controlled bribe payment described in this affidavit, agents searched CW1's personal effects but not CW1's person or vehicle.

for the Certificate of Occupancy. At approximately 1:14 p.m., CW1 met with CLADOVAN in the parking lot. The meeting was audio and video recorded.

33.    Shortly after CW1 arrived at the meet location, agents observed and video recorded CLADOVAN arrive in a black BMW and park next to CW1's vehicle in the parking lot of the Midwest Bank. Agents then observed and video recorded CLADOVAN exit his vehicle, open the driver side passenger car door of his vehicle and lean in, after which he closed the passenger side door of his vehicle, walked towards the entrance of the Midwest Bank and entered the bank.  A short time later, surveillance agents observed and video recorded CLADOVAN walk from the entrance of the bank to his vehicle, open the driver's side door, lean inside the vehicle and then close the driver's side door. Surveillance agents then observed and video recorded CLADOVAN walk towards CW1's vehicle, reach inside his left pants pocket and enter CW1's vehicle from the passenger's side.

34.    While CLADOVAN was inside CW1's vehicle, CW1 and CLADOVAN discussed among other things the $3500 payment from CLADOVAN to CW1, $2000 of which as previously agreed was bribe money to obtain the Certificate of Occupancy for 2754 West Washington.  CLADOVAN said: "Ok, so this is the thirty five hundred." CW1 thanked CLADOVAN.[8]

---

[8]

On August 8, 2007, CW1, acting at the direction of agents, paid controlled cash bribes in the amount of $500 each to a zoning inspector, Anthony Valentino, and a ventilation inspector, Thomas Ziroli, pertaining to inspections at 2754 West Washington, in exchange for issuing favorable inspections. CW1 represented to ventilation inspector Ziroli and zoning inspector Valentino that the cash bribe money came from the developer on the property (CLADOVAN).  Valentino and Ziroli have each been charged in separate criminal complaints.

35.     Due to the location of surveillance agents, agents were unable to observe or video record whether any items were passed between CW1 and CLADOVAN during the meeting. Following the meeting, surveillance agents observed and video recorded CLADOVAN exit CW1's vehicle and get into his vehicle. Agents followed CW1 away from the meeting and met with CW1 at a briefing location. CW1 provided agents with $3500 that CW1 said had been provided by CLADOVAN, of which $1,500 was for CW1's expediting fee and $2,000 for the bribes for inspectors.

36.     Investigators obtained information from two confidential sources who are both professionals in the marketing and sales of new construction and condominium rehabilitations in Chicago with fourteen years of experience. The sources informed investigators that the typical profit margin for a developer on the sale of a project that is a multi-unit condominium rehabilitation or new construction condominium building located in Chicago is at least 20%. The profit margin range can vary based upon variables including the original cost of the land, construction costs, and time on the market before sale. One of the sources, who is familiar with the underlying financing of such projects, informed investigators that lenders generally require that the developer establish a minimum of a 20% profit cushion before the lender will finance the project. Based upon a review of publicly available information, the property at 2754 West Washington is an eight unit condominium building. One of the units in the building has been sold for $310,000.

37.     A review of City of Chicago records and the City's web site revealed that the City of Chicago is a unit of local government that received in excess of $10,000 in federal funding in a twelve-month period from August 7, 2006 through August 7, 2007.

### *Later Controlled Bribe Payment Pertaining to 2734 North Fairfield Avenue*

38.    On August 17, 2007, at approximately 1:59 p.m., CW1 received a call from CLADOVAN.   The call was consensually recorded and I have reviewed the recording of this conversation.  During the call, CLADOVAN asked CW1 for a Zoning Compliance Certificate for a property located at 2734 North Fairfield.  CLADOVAN asked CW1 if CW1 could "get me approval of units" telling CW1 that he was "selling a building it's a three flat 2734 North Fairfield" that had two units and a coach house and wanted to "get a zoning for closing," "approval from Zoning, the number of units " in order to sell the property.  CW1 confirmed that what CLADOVAN needed was a Zoning Compliance Certificate and that he needed it by the following week.  CW1 responded that that would be difficult since it was usually taking ten days and there was a $90 check needed for the Department of Revenue.  CW1 then asked if CLADOVAN wanted CW1 to "go a different route" and see if CW1 could "push it along through someone." CLADOVAN responded that if CW1 could "do it sooner" that "would be great."  CW1 asked CLADOVAN if "you want me... whatever it takes, then."  CW1 has told investigators that CW1 was asking CLADOVAN if he was willing to pay whatever bribe amount necessary to obtain the Zoning Compliance Certificate.   CLADOVAN responded, "Yeah, I mean whatever, hopefully, yeah" [which CW1 told investigators CW1 understood to mean that CLADOVAN was agreeing to pay whatever bribe money was needed].  CW1 agreed to "get the paper started" and would let him know.

39.    On August 21, 2007, at approximately 10:04 a.m., CW1 received a call from CLADOVAN.   The call was consensually recorded, and I have reviewed the recording of this conversation. During the call, CW1 gave CLADOVAN an update

regarding the Zoning Compliance Certificate.  CW1 informed CLADOVAN that CW1 was trying to see if "my guy is around" explaining further "the guy in the Zoning Department to see if we can rush that." CW1 also reminded CLADOVAN about the $90 City fee.  CLADOVAN confirmed that he needed it in the next two to three days at the latest because the closing was in three days.

40.     About an hour later, at approximately 11:12 a.m., CW1 at the direction of agents, CW1 made a consensually recorded call to CLADOVAN.  I have reviewed the recording of this conversation. During the call, CW1, who was at the Zoning Department at the time attempting to pick up the Zoning Compliance Certificate for the Fairfield property, told CLADOVAN that there was an issue with the number of the units for the property.  CW1 explained that the Zoning Department was showing the property as having two units only – one in front and one in back – and asked whether he had an old Zoning Compliance Certificate that showed three units.  CLADOVAN explained that he did not have a Zoning Compliance Certificate but had worked with Beny Garneata to obtain a building permit six years earlier, and Garneata had shown CLADOVAN a printout for the property showing more than one unit in the front that Garneata said he had obtained from the Zoning Department.[9]  CW1 asked CLADOVAN if what Garneata did was a "special" [which CW1 told investigators referred to having acquired the extra unit illegally].  CLADOVAN responded that he did not think so. CLADOVAN told CW1 that he needed the "cert for three units, two in front, one in the back" because that was

---

[9] Garneata is the owner/operator of M5 Electrical Contractors and M3 Plumbing.  CW1 first met Garneata in 1998 and had performed expediting services over the past ten years for Garneata and associates of Garneata.  Garneata is charged in a separate criminal complaint.

the way he sold them. CW1 told CLADOVAN that it might require a zoning inspection but that CW1 would do CW1's best to get the "certs" approved for the three units.

41.    Later that day, at approximately 12:45 p.m., at the direction of agents, CW1 made a consensually recorded telephone call to CLADOVAN. I have reviewed the recording of this conversation. During the conversation CW1 told CLADOVAN that CW1 had the "certs" for CLADOVAN. CW1 confirmed that CW1 was "able to get it for two in the front building and one in the rear" and told him that "everything is stamped on it." CW1 told investigators that this meant that all the approvals were on the Certificate. CW1 informed CLADOVAN that he needed to meet with CW1 that day. CW1 reminded CLADOVAN that "it's going to be total of fifteen ninety." CW1 told investigators that CW1 meant that the payment due was $1590 which included the bribe money, CW1's fee, and the City fee of $90. CW1 reiterated that "you know, as you are aware of, that there was a rush situation on your behalf and I had to do whatever was needed to get it issued." CW1 and CLADOVAN made arrangement to meet later that same day at the same bank where they had met previously. CW1 again reminded CLADOVAN that "it will be fifteen ninety."

42.    On August 21, 2007, CW1 met with agents at the briefing location. An audio recording device was placed on CW1. CW1 drove in CW1's vehicle followed by agents to the meeting location the Midwest Bank located at 4012 North Pulaski, in Chicago to meet with CLADOVAN in order to pick up the bribe payment from CLADOVAN for the Certificate of Zoning Compliance. At approximately 1:28 p.m., CW1 met with CLADOVAN in the parking lot. The meeting was audio and video recorded.

43.     Surveillance agents observed and video recorded CLADOVAN's vehicle, a black BMW X5, parked in the parking lot of the Midwest Bank.  Surveillance agents then observed and video recorded CW1 arrive at the parking lot in CW1's vehicle and park next to CLADOVAN's vehicle, at which point CLADOVAN got out of his vehicle, walked towards CW1's vehicle, and entered CW1's vehicle from the passenger's side.

44.     While CLADOVAN was inside CW1's vehicle,  CW1 and CLADOVAN discussed the fact that the Zoning Compliance Certificate appeared to be legitimate and the $1590 payment from CLADOVAN to CW1, a portion of which as previously agreed, was bribe money to obtain the Zoning Compliance Certificate.

| | |
|---|---|
| CW1: | Two in the front building and one in the rear. Two and one, that's all. Here is the envelope. |
| CLADOVAN: | So this… is it.. is that's how they stamp it right? |
| CW1: | Yeah. That's how they stamp it.  That's official. You see it's stamped up there, too. [CW1 has told investigators that CW1 was assuring CLADOVAN that the Zoning Compliance Certificate was stamped to appear as though legitimate.] |
| CLADOVAN: | Uh hum… ok. |
| CW1: | Ok, it's fifteen-ninety right? |
| CLADOVAN: | Uh hum. |
| CW1: | Alright, Pete.. |
| CLADOVAN: | Ok.[10] |

---

[10] CW1 did not make any later actual payment to a City inspector at the direction of agents for the Fairfield property.

45.    Due to the location of surveillance agents, agents were unable to observe or video record whether any items were passed between CW1 and CLADOVAN during the meeting.  Surveillance agents observed and video recorded CLADOVAN get out of CW1's vehicle with documents in his hands and then get into his vehicle and drive out of the parking lot a short time later. Agents followed CW1 away from the meeting and met with CW1 at a briefing location. CW1 provided agents with $1590 that CW1 said had been provided by CLADOVAN, of which $1,500 was for CW1's expediting fee and for the bribes for inspectors.

46.    Based on the facts described above, I submit that there is probable cause to believe that PETRU CLADOVAN, between on or about June 6, 2007 and on or about August 7, 2007 corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence or reward an agent of the City of Chicago, a local government, in connection with any business, transaction, and series of transactions of the City of Chicago involving anything of value of $5000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 7, 2006 through August 7, 2007, in violation of Title

18, United States Code, Section 666 (a)(2).

David Hodapp
Postal Inspector
United States Postal Inspection Service


Subscribed and sworn to me this
21 day of May, 2008:

Martin C. Ashman
U.S. Magistrate Judge